# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 3:25-mc-00335 A-B |
| Information associated with the Google Accounts blucescu@gmail.com and gina.beni@gmail.com that is stored at premises controlled by" Google LLC | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Information associated with accounts blucescu@gmail.com and gina.beni@gmail.com as described in Attachment A-1 and Attachment A-2 hereto,

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud or Money Laundering |

The application is based on these facts:

See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Kevin Darling
*Applicant's signature*

_____
Kevin Darling, Special Agent, SBA-OIG
*Printed name and title*

Sworn to pursuant to Fed. R. Crim. P. via telephone at 3:52 pm.

Date: _____March 25, 2025_____

*Youlee Yim You*
*Judge's signature*

City and state: ___Portland, Oregon___

Hon. Youlee Yim You, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF KEVIN DARLING

**Affidavit in Support of an Application
for a Search Warrant for Email Accounts**

I, Kevin Darling, being duly sworn, depose and state as follows:

**Introduction and Agent Background**

1.      I am a Special Agent of the U.S. Small Business Administration Office of
Inspector General ("SBA-OIG") and have been so employed since August 2023.  While assigned
to SBA-OIG, I have undergone a structured mentorship program and have completed courses
concerning Coronavirus Aid Relief and Economic Security (CARES) Act Fraud, as well as laws
and regulations commonly involved with CARES Act investigations.  As a Special Agent with
SBA-OIG, I have conducted and/or participated in investigations concerning, among other areas,
false statements, theft of government funds and property, identity theft, wire fraud, bank fraud,
money laundering and aggravated identity theft.  Prior to being employed with SBA-OIG, I was
employed by the U.S. Department of Labor, U.S. Department of Energy, and the U.S. Army
Criminal Investigation Division (CID) as a Special Agent.  My duties and responsibilities
included conducting investigations of suspected violations of the United States Code and
applicable statutes of the Uniform Code of Military Justice, including investigations concerning
frauds against the United States, identity theft, wire fraud, mail fraud, forgery, and false
statements.  I have interviewed witnesses, victims, and subjects who were involved in and/or had
knowledge of violations of the United States Code and have applied their testimony to further
investigative activity.  I have assisted in the execution of numerous search warrants, such as of
personal residences, computers, hard drives, email accounts, and bank accounts.  I have also had
training in the handling, seizure, preservation, and documentation of digital devices and data, as

**Affidavit of Kevin Darling**                                                                 **Page 1**

well as the basic concepts that govern computer and cellular networks. As an agent participating with the investigation associated with this affidavit, I am fully familiar with the facts and circumstances surrounding the case.

2.      I submit this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google LLC (the "Provider") to provide information, including the content of communications, associated with the following two accounts:

- blucescu@gmail.com, subscribed to Beniamin Lucescu ("defendant") ("TARGET ACCOUNT 1"); and

- gina.beni@gmail.com, subscribed to Georgeta Lucescu ("Georgeta") ("TARGET ACCOUNT 2, and together with TARGET ACCOUNT 1, the "TARGET ACCOUNTS"),

as further described in Attachment A-1 and Attachment A-2 to this affidavit. As set forth below, I have probable cause to believe the TARGET ACCOUNTS contain evidence, as set forth in Attachment B to this affidavit, of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering) (together, the "Target Offenses").

3.      On August 4, 2014, defendant and Georgeta opened an Umpqua business bank account on behalf of Rose City Senior Care LLC ("Rose City") ending in X4850 ("Account X4850").

4.      On September 21, 2021, defendant and Georgeta opened an Umpqua joint personal bank account ending in 3688 ("Account X3688").

5.      On February 8, 2021, defendant created an account with BAM Trading Services,

**Affidavit of Kevin Darling**                                                    **Page 2**

Inc. ("BAM Trading"), a cryptocurrency exchange. Defendant's BAM Trading user id is X6231.

6.      On March 19, 2021, defendant signed a Supplemental Individual Account Application with Prime Trust, LLC ("Prime Trust"). Prime Trust does not retain funds on BAM Trading's behalf, but offers an Application Programming Interface technology for users to transfer funds from traditional banking platforms to a cryptocurrency exchange platform. In essence, Prime Trust accounts can serve as a deposit channel for a wire of funds from a traditional financial institution to a cryptocurrency exchange, like BAM Trading.

7.      On the Prime Trust application, defendant stated the intended purpose of the account was "[o]ccasional, personal trading to speculate on virtual currency prices." Defendant further stated that he "maintains an account with BAM Trading Services Inc. ("BAM") to trade virtual currencies." The account application resulted in the establishment of "BAM Linked" Account X9415 ("BAM Account X9415").

8.      The investigation revealed that TARGET ACCOUNT 1 and TARGET ACCOUNT 2 are subscribed to defendant and Georgeta, respectively because:

    a.  The TARGET ACCOUNTS were listed on the Signature Card for Account X3688.

    b.  TARGET ACCOUNT 1 was listed on defendant's account opening with BAM Trading on February 8, 2021.

    c.  TARGET ACCOUNT 1 is listed on defendant's BAM Account X9415 profile.

    d.  On or about April 6, 2020, both TARGET ACCOUNTS were listed and submitted on Economic Injury Disaster Loan ("EIDL") Application #3600888817 by the defendant or Georgeta in an effort to attain CARES Act funding. On or about

August 6, 2020, TARGET ACCOUNT 2 was used by the SBA to transmit the DocuSign request for EIDL Modification 0 to Georgeta in order for her to certify, digitally sign, and agree to the terms of the Loan Authorization and Agreement ("LA&A"). Also on August 6, 2020, TARGET ACCOUNT 2 was logged in to and used to certify, digitally sign, and submit the completed LA&A for EIDL Modification 0, returning it to the SBA for processing and funding. Georgeta's electronic signature appears on this LA&A.

e.   On or about August 7, 2020, EIDL Application #3600888817 was approved and transitioned to EIDL Loan # 4736878201. On or about August 11, 2021, TARGET ACCOUNTS 1 and 2 were used by the SBA to transmit the DocuSign request for EIDL Modification 1 to the defendant and Georgeta, in order for them to certify, digitally sign, and agree to the terms of the Amended LA&A. Also, on or about August 11, 2021, TARGET ACCOUNTS 1 and 2 were logged in to and used to certify, digitally sign, and submit the completed Amended LA&A for EIDL Modification 1, returning it to the SBA for processing and funding. Both defendant's and Georgeta's electronic signatures appear on this LA&A.

f.   On or about May 9, 2022, TARGET ACCOUNTS 1 and 2 were used by the SBA to transmit the DocuSign request for EIDL Modification 2 to the defendant and Georgeta in order for them to certify, digitally sign and agree to the terms of the Amended LA&A. Also, on or about May 9, 2022, TARGET ACCOUNTS 1 and 2 were logged in to and used to certify, digitally sign, and submit the completed Amended LA&A for EIDL Modification 2, returning it to the SBA for processing

and funding.  Both defendant's and Georgeta's electronic signatures appear on this LA&A.

    g.   On or about February 7, 2024, I and another SBA-OIG agent conducted a non-custodial interview of defendant.  Upon completion of the interview, defendant provided me TARGET ACCOUNT 1 for me to email a scanned copy of the written interview statement defendant agreed to after the interview.  Later the same day, I scanned and sent a copy of the written interview statement to the defendant via TARGET ACCOUNT 1.  Also, between July 5 and July 10, 2024, defendant and I corresponded via email using TARGET ACCOUNT 1.

9.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.  The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Target Offenses

10.    I believe there is probable cause that evidence of the Target Offenses will be found in the places to be searched.  Below are the elements of each Target Offense.

- **Wire Fraud.**  A person is guilty of Wire Fraud, in violation of 18 U.S.C. § 1343, if the United States proves the following four elements beyond a reasonable doubt:  (1) the person knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a

scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the person acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the person used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

- **Money Laundering.** A person is guilty of money laundering, in violation of 18 U.S.C. § 1957, if the United States proves the following three elements beyond a reasonable doubt: (1) the person knowingly engaged or attempted to engage in a monetary transaction, that is, a deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution; (2) the person knew the transaction involved criminally derived property, that is, property constituting, or derived from, the proceeds obtained from a criminal offense; (3) the property had a value greater than $10,000; (4) the property was, in fact, derived from specified unlawful activity; and (5) the transaction occurred in the United States.

- **Attempt and Conspiracy.** A person is guilty of attempt or conspiracy to commit wire fraud or money laundering, in violation of 18 U.S.C. § 1349, if the United States proves the following two elements beyond a reasonable doubt: (1) there was an agreement between two or more persons to commit the crime of wire fraud or money laundering; and (2) the defendant became a member of that conspiracy knowing of its object and intending to help accomplish it.

/ / /

**Affidavit of Kevin Darling**                                          **Page 6**

**Relevant Electronic and Wire Communication Statutes**

11.     The relevant federal statutes involved in the disclosure of customer

communication records for the requested data in the TARGET ACCOUNTS are as follows:

a.     18 U.S.C. § 2703(a) provides, in part: "A governmental entity may require

the disclosure by a provider of electronic communication service of the contents of a wire or

electronic communication, that is in electronic storage in an electronic communications system

for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures

described in the Federal Rules of Criminal Procedure by a court of competent jurisdiction."

b.     18 U.S.C. § 2703(b)(1) provides, in part: "A governmental entity may

require a provider of remote computing service to disclose the contents of any wire or electronic

communication . . . (A) without required notice to the subscriber or customer, if the

governmental entity obtains a warrant issued using the procedures described in the Federal Rules

of Criminal Procedure by a court of competent jurisdiction."

c.     18 U.S.C. § 2703(c)(1) provides, in part: "A governmental entity may

require a provider of electronic communication service or remote computing service to disclose a

record or other information pertaining to a subscriber to or customer of such service (not

including the contents of communications) . . . when the governmental entity—(A) obtains a

warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a

court of competent jurisdiction."

d.     18 U.S.C. § 2510(12) defines "electronic communication" as "any transfer

of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole

or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects

**Affidavit of Kevin Darling**                                        **Page 7**

interstate or foreign commerce," with certain exceptions not applicable here.

     e.    18 U.S.C. § 2510(17) defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

     f.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A) and 2711. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### Summary of Probable Cause

     12.    Following an investigation by the SBA-OIG, defendant was indicted in the United States District Court for the District of Oregon with one count of Wire Fraud, in violation of 18 U.S.C. § 1343, in case number 3:24-cr-00235-AB. As set forth in the Indictment, defendant and his wife, Georgeta Lucescu, made false statements about their intended use of CARES Act funds for his and Georgeta's business, Rose City Senior Care LLC ("Rose City"), on one LA&A and two Amended LA&As to obtain about $487,800 in proceeds from the EIDL Program. Specifically, defendant and Georgeta lied on the three LA&As about Rose City's intended use of the loan proceeds and certified that (a) all of the loan proceeds would be used as working capital to alleviate injury caused by the COVID-19 pandemic and (b) none of the proceeds would be used primarily for personal, family, or household purposes. Shortly after receiving the loan proceeds, defendant and Georgeta used the loan proceeds for paying off tax debt incurred prior to the pandemic and for investments in cryptocurrency, neither of which were authorized uses

**Affidavit of Kevin Darling**                                                           **Page 8**

under the CARES Act EIDL Program.

13.    The EIDL Loan application and multiple LA&A Signature Certificates of completion listed the TARGET ACCOUNTS as Rose City's business and primary contact emails and was electronically signed by the defendant or Georgeta using a digital signature associated with the TARGET ACCOUNTS.  Accordingly, I believe that a search of the TARGET ACCOUNTS will yield evidence of violations of the Target Offenses.

**Statement of Probable Cause**

**A.    Background on the COVID Disaster-Relief Loans.**

14.    The Coronavirus Aid, Relief, and Economic Security Act ("CARES"), Pub. L. 116-136, 134 Stat. 281 (2020), is a federal law enacted on or around March 27, 2020, designed to provide emergency financial assistance to individual Americans and small businesses suffering economic effects caused by the Coronavirus Disease 2019 ("COVID-19") pandemic.  Continued relief efforts followed under the Consolidated Appropriations Act of 2021, Pub. L. 116- 260, 134 Stat. 1182 (2021), enacted on or around December 27, 2020, in which the Coronavirus Response and Relief Supplemental Appropriations Act of 2021 ("CRRSAA") included two sources of relief for small businesses, the EIDL program and the Paycheck Protection Program (PPP).

15.    The EIDL program was a Small Business Administration (SBA) program that provided low-interest financing to small businesses, renters, and homeowners affected by declared disasters.  The CARES Act and CRRSAA authorized the SBA to issue EIDLs (and additional advances of up to $10,000) to small businesses within three days of applying for an EIDL.  EIDLs must be repaid and were determined based upon the number of certified employees by the applicant.  EIDL authorized advances do not have to be repaid.

**Affidavit of Kevin Darling**                                                              **Page 9**

16.     To obtain an EIDL and/or an EIDL advance, qualifying businesses were required to submit an application to the SBA and provide information about business operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster; in the case of EIDLs for COVID-19 relief, the 12-month period preceding January 31, 2020. The applicant was also required to certify that all application information submitted was true and correct to the best of the applicant's knowledge.

17.     EIDL applications were received in cloud-based platforms.  The amount of an EIDL, if approved, was determined based, in part, on information provided within the application about employment, revenue, and cost of goods, as described above.  Any funds issued under an EIDL, or advance were issued directly by the SBA.

18.     Under 13 CFR § 123.303, EIDL proceeds could only be used for "working capital necessary to carry your concern until resumption of normal operations and for expenditures necessary to alleviate the specific economic injury" caused by the COVID-19 pandemic and could not be used to pay any "penalty for non-compliance with a law, regulation, or order of a federal, state, regulation, or local agency[.]"  The Loan Authorization and Agreement required to get an EIDL provided: "Use of Loan Proceeds[:] Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury *caused* by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]" (emphasis added)

19.     Based on my training and experience involving the EIDL program,13 CFR § 123.303, and the Loan Authorization and Agreement, EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and

**Affidavit of Kevin Darling**                                                    **Page 10**

mortgage payments.  But EIDL funds could not be used primarily for personal, family, or household goods.  EIDL funds could also not be used for tax debt incurred before the COVID-19 pandemic because that debt was not caused by the COVID-19 pandemic and tax penalties, regardless of when incurred, were ineligible expenses.

**B.    Defendant And Georgetta Applied for $487,800 in EIDL Loan Proceeds Using the TARGET ACCOUNTS**

20.    Between April 2020 and May 2022, defendant and Georgeta applied for and obtained three EIDL loans for Rose City.

**1.    EIDL APPLICATION #3600888817**

21.    On or about April 6, 2020, defendant or Georgeta began the process of submitting materials to the SBA requesting EIDL funding through EIDL application #3600888817 on Rose City's behalf listing both TARGET ACCOUNT 1 and TARGET ACOUNT 2 on the EIDL application.

22.    On or about August 6, 2020, defendant or Georgeta electronically signed an EIDL LA&A for a $56,600 EIDL, using TARGET ACCOUNT 2, to the SBA for use by Rose City as "all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[,]" and that "none of the Obligations are or will be primarily for personal, family or household purposes[.]"  A snapshot of the signature is below:

Rose City Senior Care, LLC

Georgeta Lucescu

Date:    08.06.2020

_____
Georgeta Lucescu, Owner/Officer

**Affidavit of Kevin Darling**                                                    **Page 11**

23.     On or about August 7, 2020, EIDL Application #3600888817 was approved and transitioned to EIDL Loan # 4736878201.  On or about August 10, 2020, the SBA disbursed $56,600 (minus a $100 processing fee) to Account X4850.  At the time of deposit, Account X4850 had approximately $11,054.35.

24.     Instead of using the EIDL loan for permissible purposes as required, and as certified, between August 21, 2020, and September 22, 2020, the defendant or his wife made the following payments to the IRS for federal tax debt totaling $51,506.34:

- 8/21/2020 – ACH Debit IRS USA Tax Payment - $9,472.23

- 8/21/2020 – ACH Debit IRS USA Tax Payment - $9,665.62

- 8/24/2020 – ACH Debit IRS USA Tax Payment - $17,656.10

- 9/22/2020 – ACH Debit IRS USA Tax Payment - $14,712.39

25.     At this time, I do not know whether this debt was personal or business, but I believe it is probable that this debt was incurred before the COVID-19 pandemic and thus an illegible expense of the EIDL proceeds because the tax debt was not an "economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter."  Specifically, defendant or Georgeta submitted Rose City's 2020 Employer's Quarterly Federal Tax Return Form 941s for all four quarters of 2020 and those show Rose City claimed one employee for the 2020 year, paid $18,000 in wages and withheld $996 in Federal income tax.  Additionally, I have reviewed defendant and Georgeta's Form 1040 U.S. Individual Income Tax Returns for 2019 and 2020 and those show defendant and Georgeta filed jointly and owed a total of $2,935 for 2019 and $439 for 2020 in federal income tax.  The above listed $51,506.34 in federal IRS tax payments that were paid between August 21, 2020, and September 22, 2020, do not appear to be

**Affidavit of Kevin Darling**                                                                                    **Page 12**

associated with employer quarterly taxes, or individual income tax owed in 2020.

### 2.    First Modification to the EIDL

26.    On August 11, 2021, TARGET ACCOUNTS 1 and 2 were used by the SBA to transmit the DocuSign request for EIDL Modification 1 to the defendant and Georgeta in order for them to certify, digitally sign, and agree to the terms of the Amended LA&A.  Also on August 11, 2021, TARGET ACCOUNTS 1 and 2 were logged into and used to certify, digitally sign, and submit the completed Amended LA&A for EIDL Modification 1, returning it to the SBA for processing and funding.  On that agreement, the defendant and his wife certified that Rose City would "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter[,]" and that "none of the Obligations are or will be primarily for personal, family or household purposes[.]"   A snapshot of the signatures is below:

**Rose City Senior Care, LLC**

Georgeta Lucescu          Date:   08.11.2021
9FE1221F032740E...

Georgeta Lucescu, Owner/Officer

Beniamin Lucescu          Date:   08.11.2021
A7DB60FE0E3B419...

Beniamin Lucescu, Owner/Officer

27.    On or about August 17, 2021, the SBA approved modification 1, to SBA Loan #4736878201 and disbursed $143,400 to Account X4850.  At the time of deposit, Account X4850 had approximately $3,823.89.

28.    Additionally, instead of using the EIDL loan for permissible purposes as required, and as certified, between September 24, 2021, and October 12, 2021, defendant or Georgeta

**Affidavit of Kevin Darling**                                          **Page 13**

transferred $110,000 from Account X4850 to Account X3688, and then defendant invested that

money into cryptocurrency via the following wire transactions from Umpqua Bank via Prime

Trust to BAM Trading:

| Date | Source | Destination | Amount |
|---|---|---|---|
| September 28, 2021 | Account X3688 | BAM Trading User X6231 | $55,000 |
| October 12, 2021 | Account X3688 | BAM Trading User X6231 | $55,000 |

### 3.    Second Modification to the EIDL

29.    On or about May 9, 2022, TARGET ACCOUNTS 1 and 2 were used by the SBA

to transmit the DocuSign request for EIDL Modification 2, to the defendant and Georgeta in

order for them to certify, digitally sign, and agree to the terms of the Amended LA&A.  Also on

May 9, 2022, TARGET ACCOUNTS 1 and 2 were logged into and used to certify, digitally sign,

and submit the completed Amended LA&A for the EIDL Modification 2, returning it to the SBA

for processing and funding.  On that agreement, defendant and Georgeta certified that Rose City

would "use all the proceeds of this Loan solely as working capital to alleviate economic injury

caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[,]" and

that "none of the Obligations are or will be primarily for personal, family or household

purposes[.]"  A snapshot of the signatures is below:



30.    On May 9, 2022, and upon completion of the DocuSign signatures the Amended

LA&A was transmitted from both TARGET ACCOUNTS via wire from Portland, Oregon to the SBA servers in Des Moines, Iowa.

31.    On or about May 17, 2022, the SBA approved Modification 2, for SBA Loan #4736878201 and disbursed $287,800 to Account X4850. At the time  Account X4850 had approximately $3,683.26.

32.    Instead of using the EIDL loan for permissible purposes as required, and as certified, on May 18, 2022, defendant or Georgeta transferred $285,000 from Account X4850 to Account X3688, and then defendant invested that money into cryptocurrency via the following wire transaction from Umpqua Bank via Prime Trust to BAM Trading:

| Date | Source | Destination | Amount |
|------|--------|-------------|--------|
| May 18, 2022 | Account X3688 | BAM Trading User X6231 | $300,000 |

At the time the $285,000 of EIDL proceeds was deposited into Account X3688, that account had approximately $16,270.86.

**C.    Defendant Is Investigated and Charged with Wire Fraud**

33.    SBA-OIG initiated an investigation into whether defendant made materially false representations in his borrower application and supporting documents to obtain the EIDL Loans. The investigation, included, among other investigative activity, the review of records from Umpqua Bank, and Oregon Department of Revenue, and defendant's court filings in 3:09-cr-00247-MO about his intended use of the EIDL proceeds, determined that defendant made materially false representations in the LA&As about his intent.

34.    Specifically, defendant and Georgeta applied for and obtained EIDL loans for Rose City with the intent to steal and to convert the proceeds of those loans to their personal use

**Affidavit of Kevin Darling**                                                          **Page 15**

and without any intent to use the proceeds thereof for any authorized purposes.

35.     Defendant admitted this in a court filing and then swore under oath the court filing was truth.

36.     Specifically, on August 1, 2011, in *United States v. Beniamin Lucescu*, # 3:09-cr-00247-MO, defendant was found guilty of three counts of bank fraud and two counts of wire fraud and subsequently sentenced to 1 day in prison for each of the five counts to be served concurrently, supervised release of 5 years, and restitution of $365,059.93.  Because defendant paid limited amounts toward his restitution obligation, on November 21, 2022, the Court ordered a writ of garnishment against defendant, which defendant contested.

37.     On January 9, 2023, related to the garnishment proceeding, defendant filed "Defendant's Memorandum To The Court," in which he made representations about how he and Georgeta intended to use the EIDL proceeds.

38.     On February 13, 2023, the United States District Court for the District of Oregon held a garnishment hearing.  Under oath, defendant swore "under the penalty of perjury that what [he] submitted to the Court already in writing [in "Defendant's Memorandum To The Court"] in this case [was] true."

39.     First, in "Defendant's Memorandum To The Court," defendant stated "[D]uring 2020 our bank offered us a loan that did not require any kind of documentation, it just allowed businesses to borrow on pretty affordable terms ... the amount was only $56,500.  We normally don't like to borrow, but because the Federal and State Tax debts were well over $100,000 and penalties and interests were adding up fast, we accepted the loan offer and used that money to pay off a part of our tax debts."

**Affidavit of Kevin Darling**                                                        **Page 16**

40.     Based upon my knowledge of the investigation, and my training and experience, I believe this statement relates to EIDL Application #3600888817 detailed above through which Rose City received $56,500 on August 10, 2020, and between August 21, 2020, and September 22, 2020, defendant paid off $51,506.34 of federal tax debt.   As detailed above, I believe this tax debt was incurred prior to the COVID-19 pandemic.

41.     Second, in the memorandum, defendant stated "During this time in 2020, my brother was dabbling and was having a good degree of success in cryptocurrencies investments and was sharing his experience with me, giving me and my wife the idea that this field of investment while volatile could be an option for us in the future.  So, in April 2021, my wife borrowed $21,500 . . . and we sent the funds to Prime Trust the onboarding service for Binance US, the cryptocurrency investment account [to invest in cryptocurrency].  Later in the year we received an offer to increase the amount of the existing business loan ... So, in August of 2021 we accepted an increase offer to our business loan up to $200,000 ($143,500 balance was distributed to our business account).  We then used part of the balance we received to further pay down some of our business and personal tax debts but also decided to increase our cryptocurrencies investments with some of that balance.  So, in September and in October 2021 we sent two wires totaling $110,000 to Prime Trust to be transferred to our Binance US cryptocurrency account."

42.     Based upon my knowledge of the investigation, and my training and experience, I believe this statement relates to EIDL Modification 1 detailed above through which Rose City received $143,500 on August 17, 2021, and invested $110,000 of the loan proceeds in cryptocurrency between September 24, 2021, and October 12, 2021.

**Affidavit of Kevin Darling**                                    **Page 17**

43.     Third, in the memorandum, defendant stated "At the end of April [2022] ..., we again received one final offer to increase the loan amount to the equivalent of 24 months of deposits ($487,800), motivated by the previously described sentiments [of paying off tax debt and investing in cryptocurrency] we accepted this last offered increase and on May 17th we received into our business account a balance of loan proceeds of $287,800 and rounded that off to $300,00[0] and sen[t] it to ... further finance the crypto investment account[.]"

44.     Based upon my knowledge of the investigation, and my training and experience, I believe this statement relates to EIDL Modification 2 detailed above through which Rose City received $287,800 on May 17, 2021, and the next day defendant invested $285,000 of the loan proceeds in cryptocurrency.

45.     On February 7, 2024, I and another SBA-OIG agent conducted a non-custodial interview of defendant.  During the interview, defendant told the agents that he spent the EIDL proceeds on payroll, medical supplies, equipment costs, IRS debt and tax liens, and mortgage payments.  Defendant was not questioned about and did not mention using the proceeds to invest in cryptocurrency.  After the interview, defendant agreed to a written summary statement of the interview that stated "upon receiving the EIDL loan proceeds, [he] used these funds for business related expenses, including as I described payroll, equipment costs, other costs, and additional things I considered such as debt including tax liens and behind payments on my mortgage.  I considered all the EIDL funding to be used on business related expenses[.]"

46.     Based on my knowledge of the investigation, including the TARGET ACCOUNTS identified on the EIDL Application and associated with defendant and Georgeta's DocuSign Signatures used to execute the required loan documents, "Defendant's Memorandum

**Affidavit of Kevin Darling**                                                    **Page 18**

To The Court," the immediacy of the transfers, the interview of defendant, and my training and experience, Defendant and Georgeta intended to misuse the EIDL proceeds to pay off tax debt and invest in cryptocurrency and used the TARGET ACCOUNTS to falsely certify and electronically sign the three LA&As to receive those proceeds.

47.    On June 11, 2024, defendant was indicted for Wire Fraud in *United States v. Beniamin Lucescu*, 3:24-cr-00235. Trial is currently set for November 18, 2025.

**Records Held by Provider**

48.    From my training and experience, I have learned Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

49.    In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

50.    Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google

Account.

51.     Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

52.     Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

53.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive.

54.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

55.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the

**Affidavit of Kevin Darling**                                                                                    **Page 20**

account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

56.    Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

57.    In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  I believe the login, time, date and location data will further define the specific person(s), who drafted, signed, certified and submitted, via wire, specific material documents used to obtain funding the defendant and his wife would otherwise not be entitled based on their intended use of the funds.

**Affidavit of Kevin Darling**                                                                 **Page 21**

58.    Based on my training and experience, messages, emails, and documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.  I believe further evidence of defendant and his wife's intent and process of criminal activity will be found in the emails and documents created and stored in support of the EIDL application and modifications to the EIDL.  I believe evidence of conspiracy may be found within email correspondence between defendant and his wife in furtherance of the specified unlawful activity.

59.    I believe the stored activity logs will reveal searches for CARES Act funding information regarding the application process and identify searches for authorized uses of the CARES Act funds, as well as information concerning CARES Act fraud schemes.  I also believe the location data will reveal the location for both defendant and his wife at times and dates the EIDL documents were signed and submitted, as well duplicate logins from different locations. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information**:** email and messaging logs, documents, and the data associated with the foregoing, such as geo-location, date and time may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which

computers or other devices were used to access the account.  Such information also allows
investigators to understand the geographic and chronological context of access, use, and events
relating to the crime under investigation.

60.      Account activity may also provide relevant insight into the account owner's state
of mind as it relates to the offenses under investigation.  For example, information on the account
may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a
plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort
to conceal evidence from law enforcement).

61.      Other information connected to the use of a Google account may lead to the
discovery of additional evidence.  For example, the apps downloaded from the Google Play store
may reveal services used in furtherance of the crimes under investigation or services used to
communicate with co-conspirators. I believe a review of Google Play will reveal the download
of money transaction apps, likely used for known mobile fund transfers exceeding $10,000,
which were received from EIDL Modifications 1 and 2, derived from specified unlawful activity.
The fund transfers I am aware of were from Account X4850 to Account X3688 And then
defendant used those proceeds to invest in his cryptocurrency account via Binance Trading,
which also offers an app available in Google Play.  I believe this information stored by Google
could reveal the user who executed the mobile fund transfers.  In addition, emails, instant
messages, Internet activity, and documents, can lead to the identification of co-conspirators and
instrumentalities of the crimes under investigation.

62.      Therefore, Google's servers are likely to contain stored electronic
communications and information concerning subscribers and their use of Google services.  In my

**Affidavit of Kevin Darling**                                              **Page 23**

training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

63.     On March 17, 2025, I served a preservation notice served on Provider for the contents of the Email Account. No further legal process has been served on Provider for the content of the Email Account.

## Nature of Examination

64.     During its review of the information received from the Provider under this warrant, law enforcement will segregate the information into two groups: (i) information that is responsive to the warrant and that the government may therefore seize; and (ii) information that is not responsive to the warrant. This review will be performed within a reasonable amount of time not to exceed 180 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court.

65.     Information that is responsive to the warrant will be copied onto a separate storage device or medium. Responsive information may be used by law enforcement in the same manner as any other seized evidence. Information that is not responsive to the warrant will be sealed and stored on a secure medium or in a secure location. Nonresponsive information will not be reviewed again without further order of the Court (e.g., subsequent search warrant or order to unseal by the district court).

66.     The government will retain a complete copy of the information received from the Provider for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody

of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

## Conclusion

67.     Based on the foregoing, I have probable cause to believe, and I do believe, that defendant committed the Target Offenses, and that evidence of those offenses, as more fully described in Attachment B, are presently contained in the TARGET ACCOUNTS, which is more fully described above and in Attachment A-1 and Attachment A-2. I therefore request that the Court issue a warrant authorizing a search of the TARGET ACCOUNTS described in Attachment A1 and Attachment A-2 for the items listed in Attachment B and the examination and seizure of any such items found. The government will execute this warrant by serving the warrant on the Provider. Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

68.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney (AUSA) Meredith Bateman. AUSA Bateman informed me that it is her opinion that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

_Sworn by telephone_
KEVIN DARLING
Special Agent
U.S. Small Business Administration
Office of Inspector General

**Affidavit of Kevin Darling**                                    **Page 25**

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at

_3:52 pm_____ on March __25__, 2025.


_Youlee Yim You_____
HONORABLE YOULEE YIM YOU
United States Magistrate Judge

**ATTACHMENT A-1**

**Place to Be Searched**

This warrant applies to information associated with blucescu@gmail.com ("TARGET ACCOUNT 1") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at Google Legal, Investigations Support, 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT A-2**

**Place to Be Searched**

This warrant applies to information associated with gina.beni@gmail.com ("TARGET ACCOUNT 2") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at Google Legal, Investigations Support, 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT B**

**Particular Things to Be Seized**

**I.      Information to Be Disclosed by Google LLC (hereinafter "Provider")**

A.      To the extent that the information described in Attachment A-1 and Attachment A-2 is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) **on March 17, 2025, with Google Reference Number 87040196,** Google is required to disclose to the government for each account or identifier listed in Attachment A-1 and Attachment A-2 the following information **March 27, 2020, to May 18, 2022,** unless otherwise indicated:

    1.  All business records and subscriber information, in any form kept, pertaining to the Account, including:

        a.      Names (including subscriber names, user names, and screen names);

        b.      Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

        c.      Telephone numbers, including SMS recovery and alternate sign-in numbers;

        d.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

        e.      Telephone or instrument numbers or other subscriber numbers or

**Attachment B**                                                                          **Page 1**

identities, including any temporarily assigned network address, SMS recovery

numbers, Google Voice numbers, and alternate sign-in numbers

    f.       Length of service (including start date and creation IP) and types of

service utilized;

    g.       Means and source of payment (including any credit card or bank account

number); and

    h.       Change history.

    2.       All device information associated with the Account, including but not limited to,

manufacture names, model numbers, serial number, media access control (MAC) addresses,

international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and

telephone numbers;

    3.       Records of user activity for each connection made to or from the Account(s),

including, for all Google services, the date, time, length, and method of connection, data transfer

volume, user names, source and destination IP address, name of accessed Google service, and all

activity logs.

    4.       The contents of all emails associated with the account, including stored or

preserved copies of emails sent to and from the account, draft emails, and deleted emails;

attachments; the source and destination addresses associated with each email; the size, length,

and timestamp of each email; and true and accurate header information including the actual IP

addresses of the sender and recipients of the emails;

B.       The Provider is hereby ordered to disclose the above information to the government

within 14 days of issuance of this warrant.

**Attachment B**                         **Page 2**

II.    **Information to Be Seized by the Government**

A.    All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud) and/or 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) (together, the "Target Offenses"), those violations involving Beniamin Lucescu and/or Georgeta Lucescu and occurring after March 27, 2020, including, for the TARGET ACCOUNTS listed on Attachment A-1 and Attachment A-2, information pertaining to the following matters:

1.    Email messages, records, and files concerning the Economic Injury Disaster Loan Program and which concern the Target Offenses.

2.    Communications between the TARGET ACCOUNTS and Umpqua Bank and which concern the Target Offenses.

3.    Communications between the TARGET ACCOUNTS and the Small Business Administration and which concern the Target Offenses.

4.    Email messages, records, and files concerning EIDL loans applied for on behalf of Rose City Senior Care, LLC ("Rose City"), including email messages to the TARGET ACCOUNTS containing links to sign documentation related to the loans.

5.    Email messages, records, and files concerning use of the proceeds from the EIDL loans obtained on behalf of Rose City.

6.    Email messages, records, and files associated with or attached to email messages, and transactional data that constitute evidence of, that may have been used to facilitate, and that were capable of being used to commit or further violations of the Target Offenses and to create, access, or store evidence of such crimes.

**Attachment B**                                                                                          **Page 3**

7.    Information relating to who created, used, and communicated with the account, including records about their identities and whereabouts.

8.    Information indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner.

9.    Evidence indicating the account owner's and user's state of mind as it relates to the crime(s) under investigation.

10.    All records, documents, invoices, or materials associated with the account that concern accounts with an Internet service provider or a telephone service provider whose services may have been used in the commission of violations of the Target Offenses.

## III.    Search Procedure

A.    The warrant will be executed under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A), and will require Provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of this attachment.

B.    During its review of the information received from Provider under this warrant, law enforcement will segregate the information into two groups: (i) information that is responsive to the warrant and that the government may therefore seize; and (ii) information that is not responsive to the warrant.  This review will be performed within a reasonable amount of time not to exceed 180 days from the date of execution of the warrant.  If the government needs

**Attachment B**                                                                                      **Page 4**

additional time to conduct this review, it may seek an extension of the time period from the Court.

C.      Information that is responsive to the warrant will be copied onto a separate storage device or medium.  Responsive information may be used by law enforcement in the same manner as any other seized evidence.  Information that is not responsive to the warrant will be sealed and stored on a secure medium or in a secure location.  Nonresponsive information will not be reviewed again without further order of the Court (e.g., subsequent search warrant or order to unseal by the district court).

D.      The government will retain a complete copy of the information received from Provider for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Attachment B**                                                                                               **Page 5**